UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

M.T., on behalf of N.M.,

                    Plaintiff,

      - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                 Defendant.
────────────────────────────────

15-cv-2912 (JGK)

MEMORANDUM OPINION AND
ORDER

JOHN G. KOELTL, District Judge:

     The plaintiff, M.T., brings this action on behalf of her son, N.M., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., against the New York City Department of Education (the "DOE"). The plaintiff challenges the decision of the State Review Officer ("SRO") denying her payment of N.M.'s tuition for the Rebecca School, a private school for children with neurodevelopmental delays, at which she unilaterally placed N.M. for the 2010-11 school year. In an earlier decision, this Court denied cross-motions for summary judgment on the plaintiff's IDEA claim and remanded the case to the SRO for further proceedings. M.T. v. N.Y.C. Dep't of Educ., 47 F. Supp. 3d 197, 209 (S.D.N.Y. 2014) ("M.T. I").  On remand, the SRO again found for the DOE.  The plaintiff appeals the second SRO judgment. Before the Court are the parties' cross-motions for summary judgment.

1

For the reasons that follow, the defendant's motion for summary judgment on the IDEA claim is **granted** and the plaintiff's motion for summary judgment on the IDEA claim is **denied**.

## I.

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent. Sch. Dist. ("Gagliardo II"), 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Id. (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal quotation marks and citation omitted)). Because the IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Id. (internal citation omitted); see also R.S. ex rel. A.S. v. Lakeland Cent. Sch. Dist., No. 09 Civ. 9874, 2011 WL 1198458, at *1 (S.D.N.Y. Mar. 30, 2011).

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d)); see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system). The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207. In New York, the responsibility for developing an appropriate IEP for a child is assigned to a local Committee on Special Education ("CSE"). Walczak, 142 F.3d at 123. "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." R.E., 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id. (citing Gagliardo II, 489 F.3d at 107–08).

Parents in New York who wish to challenge their child's IEP as insufficient under the IDEA may request an impartial due process hearing before an Impartial Hearing Officer ("IHO") appointed by the local board of education. Walczak, 142 F.3d at

123 (citing 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)).  A
party may appeal the decision of the IHO to an SRO, and the
SRO's decision may be challenged in either state or federal
court. See id. at 122-23 (citing 20 U.S.C. § 1415(g),
1415(i)(2)(A) and N.Y. Educ. Law § 4404(2)); see also R.S., 2011
WL 1198458, at *1.  In addition, if a school district fails to
provide a FAPE to a child with disabilities, the child's parents
may, at their own financial risk, remove the child from the
improper placement, enroll the child in an appropriate private
school, and retroactively seek reimbursement for the cost of
private school from the state.  See Sch. Comm. of Burlington v.
Dep't of Educ., 471 U.S. 359, 370 (1985).

Under the IDEA, a district court must conduct an
independent review of the administrative record, along with any
additional evidence presented by the parties, and must determine
by a preponderance of the evidence whether the IDEA's provisions
have been met.[1]  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d

---

[1] The Court of Appeals for the Second Circuit has noted that,
"[s]ummary judgment in the IDEA context . . . is only a
pragmatic procedural mechanism for reviewing administrative
decisions." M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d
131, 138 (2d Cir. 2013) (internal citation and quotation marks
omitted).  However, "[t]he inquiry . . . is not directed to
discerning whether there are disputed issues of fact, but
rather, whether the administrative record, together with any
additional evidence, establishes that there has been compliance
with IDEA's processes and that the child's educational needs
have been appropriately addressed." Wall v. Mattituck–Cutchogue
Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996); see also T.G.

377, 380–81 (2d Cir. 2003); see also Gagliardo II, 489 F.3d at
112.  This independent review, however, is "by no means an
invitation to the courts to substitute their own notions of
sound educational policy for those of the school authorities
which they review."  Rowley, 458 U.S. at 206.

The Court of Appeals for the Second Circuit has explained
that "the standard for reviewing administrative determinations
'requires a more critical appraisal of the agency determination
than clear-error review . . . but . . . nevertheless[ ] falls
well short of complete de novo review . . . .[I]n the course of
th[is] oversight, the persuasiveness of a particular
administrative finding, or the lack thereof, is likely to tell
the tale.'"  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244
(2d Cir. 2012) (quoting Lenn v. Portland Sch. Comm., 998 F.2d
1083, 1086–87 (1st Cir. 1993)).  "[T]he district court's
analysis will hinge on the kinds of considerations that normally
determine whether any particular judgment is persuasive, for
example whether the decision being reviewed is well-reasoned,
and whether it was based on substantially greater familiarity
with the evidence and the witnesses than the reviewing court.
But the district court's determination of the persuasiveness of

---

ex rel. R.P. v. N.Y.C. Dep't of Educ., 973 F. Supp. 2d 320, 323
n.2 (S.D.N.Y. 2013).

an administrative finding must also be colored by an acute awareness of institutional competence and role." Id.

The Court of Appeals for the Second Circuit has also explained that "federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo II, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208); see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005). Deference to the decision in the administrative record is particularly appropriate when the administrative officers' review has been thorough and careful, and when the court's decision is based solely on the administrative record. See Walczak, 142 F.3d at 129; Frank G. v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006); see also D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ., 950 F. Supp. 2d 494, 498 (S.D.N.Y. 2013). When, as in this case, "an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision." M.W., 725 F.3d at 139 (internal citation and quotation marks omitted). However, the amount of deference to an SRO's determination "depends on the quality of that opinion." Id. (internal citation and quotation marks omitted); see D.A.B. v. N.Y.C. Dep't of Educ., 973 F. Supp. 2d

344, 350 (S.D.N.Y. 2013); see also M.T. I, 47 F. Supp. 3d at
199-201.

## II.

The Court has already set forth the facts and procedural
background of this case in M.T. I, familiarity with which is
assumed.  See M.T. I, 47 F. Supp. at 201-06.  The facts are
recited here only as necessary to decide the motion.  They are
undisputed, unless otherwise noted.

### A.

N.M. is a child classified with Asperger's Syndrome and
Attention Deficit Hyperactivity Disorder ("ADHD"). Id. at 201.
In October 2008, M.T., N.M.'s mother, unilaterally removed N.M.
from a general education class with Special Education Teacher
Support Services (SETSS) at a public school and enrolled him at
the Rebecca School for the remainder of the 2008-09 school year.
Id. He remained there for the 2009-10 school year, and the
school district paid the tuition for both years.  Id.

On May 27, 2010, the CSE met to prepare a 2010-11 IEP for
N.M. Id. at 202. Present at the meeting were M.T.; Feng Ye, a
district representative and special education teacher; Rose
Fochetta, a district school psychologist; Gwen Levine, a Rebecca
School social worker; Spencer Leeds, N.M.'s Rebecca School
teacher; and a parent representative. Id. The CSE considered a
number of documents at the meeting including a psychoeducational

evaluation of N.M. (the "Evaluation") conducted by the Rebecca School in May 2010 (Ex. 5), a 2009 classroom observation of N.M. by Ms. Fochetta (Ex. 8), and N.M.'s May 2010 Interdisciplinary Progress Report ("Progress Report") created by the Rebecca School (Ex. 9). Id.

The resulting IEP recommended a ten-month school year, and concluded that N.M. should be placed in a specialized class with a student/teacher/paraprofessional ratio of 12:1:1 at a community school. Id. at 202-03. The IEP also recommended a four-month 1:1 transitional paraprofessional for N.M. to support his transition from private to public school. Id. at 203. The CSE considered and rejected programs with ratios of 12:1 and 12:1:1 without the transitional paraprofessional because they were insufficiently supportive. Id. The IEP also included several related services for additional support, including: weekly 1:1 and 2:1 counseling for thirty minutes each intended to address N.M.'s social and emotional management needs, Ex. 4 at 9, 16; 1:1 occupational therapy twice a week for thirty minutes to address N.M.'s health and physical management needs, id.; and 1:1 speech therapy twice a week for thirty minutes, and 3:1 speech therapy once a week for thirty minutes. Id. at 10, 16; see also M.T. I, 47 F. Supp. 3d at 203.

The IEP also noted that N.M's cognitive functioning was in the average range, but that he "still presents with anxiety and

tends to give up quickly although he has showed improvement."
Ex. 4 at 3. Among other findings, the IEP stated that in the
"Social/Emotional Performance" category, N.M.'s school reports
illustrated areas of improvement, and that the Evaluation
described N.M. as "highly empathetic and attuned to the needs of
others." Id. at 4. It also explained that "assert[ing] his own
ideas and needs during peer interactions" constituted one of
N.M.'s greatest challenges. Id. The IEP concluded that N.M.'s
behavior "does not seriously interfere with instruction" and
that it could be addressed by a special education teacher,
speech and language therapy, and occupational therapy. Id; see
also M.T. I, 47 F. Supp. 3d at 203.

On June 23, 2010, the DOE mailed M.T. the Final Notice of
Recommendation ("FNR") containing its proposal to admit N.M.
into P.S. 20, a community school with the accommodations
described above. M.T. I, 47 F. Supp. 3d at 203. M.T. rejected
the offer through a letter from her attorney dated August 25,
2010 and stated she intended to enroll N.M. in the Rebecca
School unilaterally for the 2010-11 school year. Id. On July 26,
2011, M.T. filed a due process complaint notice requesting an
impartial hearing and seeking payment of N.M.'s tuition at the
Rebecca School for the 2010-11 school year. Id.

**B.**

**i.**

An impartial due process hearing was held over seven days between September 26, 2011 and April 5, 2012. Ms. Fochetta, Ms. Ye, and M.T. testified at the IHO hearing, in addition to other witnesses who had not been present at the CSE meeting, including Jennifer Chase, P.S. 20's assistant principal; Sara Rivera, P.S. 20's guidance counselor; Allison Veklotz, a P.S. 20 school psychologist; Dr. Asma Sadiq, N.M.'s behavioral pediatrician for several years; Tina McCourt, the Rebecca School's program director; Dr. Eileen Feliciano, a Rebecca School psychologist; and Carter Swope, N.M.'s Rebecca School teacher for the 2010-11 school year. Id. at 204-05.

The IHO issued its Findings of Fact and Decision on April 24, 2012, which held that the DOE failed to establish that it offered N.M. a FAPE for the 2010-11 school year. The IHO found that only those CSE members who had never worked with N.M. agreed with the proposed placement, as opposed to the Rebecca School teacher and social worker who did not believe the recommendation was appropriate. Id. at 205. It also concluded that the four-month time frame for the transitional paraprofessional was "arbitrary" and that there was no evidence to determine whether such a time period would be sufficient or what supports would be needed after four months. Id.  Finally,

the IHO held that the Rebecca School was an appropriate
placement for N.M. and that equitable considerations supported
M.T.'s request for the DOE to pay N.M.'s 2010-11 tuition. Id.

The DOE appealed the IHO decision to the SRO, which
reversed the IHO's decision. The SRO detailed the evidence
considered by the CSE regarding N.M.'s academic and behavioral
capacities and concluded that the CSE "had sufficient
information relative to the student's present levels of academic
achievement and functional performance at the time of the CSE
meeting and developed an IEP that accurately reflected the
student's special education needs."  See First SRO Opinion ("SRO
Op. I") at 13. It also concluded there was no support for the
IHO's determination that the four-month paraprofessional would
be inappropriate for N.M. Id. at 14. Because the SRO concluded
that the DOE had offered a FAPE, it did not reach the issues of
whether the Rebecca School was an appropriate unilateral
placement for N.M. or whether the equities favored M.T. for the
payment of tuition. Id. at 19.

On June 24, 2013, the plaintiff filed a complaint in this
Court challenging the SRO decision. Both parties moved for
summary judgment on the plaintiff's IDEA claim.

During the pendency of the motions, the Court of Appeals
for the Second Circuit decided Reyes v. New York City Department
of Education, 760 F.3d 211 (2d Cir. 2014), which held that it

11

was "inappropriate . . . to take into account the possibility of mid-year amendments in determining whether an IEP as originally formulated was substantively adequate." Id. at 220.

M.T. I held that the SRO erred when she based her decision as to whether the DOE offered a FAPE in part on the possibility that the transitional paraprofessional could be extended past the four-month period that was provided in the IEP.  M.T. I also held that it was "unclear . . . whether the SRO would have found that the IEP provided a FAPE without the possibility of extending the transitional paraprofessional." M.T. I, 47 F. Supp. 3d at 208.  This Court remanded the case to the SRO to determine, in light of Reyes, whether the DOE provided a FAPE without resort to the improper evidence.  Id. at 208-09.

### ii.

On January 9, 2015, an SRO, who replaced the original SRO who was unavailable, issued a subsequent decision that determined that the DOE offered a FAPE even if the transitional paraprofessional could not be extended beyond four months. See Second SRO Opinion ("SRO Op. II") at 6. It first explained how the elements of the IEP properly supported N.M.'s areas of need. It noted that state regulations provide that a 12:1:1 special class placement is designed to address students like N.M., "whose management needs interfere with the instructional process," id. (quoting 8 NYCRR 200.6[h][4][i]), while the

12

counselling, speech-therapy, and occupational therapy sessions were intended to address N.M.'s needs in language processing, fine motor skills, and social and emotional functioning. Id. It also concluded that neither the law nor the hearing record supported the IHO's finding that N.M. required 1:1 support beyond the four-month period provided in the IEP. Id. at 6-7.

In addition, it found that the hearing record supported the CSE's recommendation of a four-month transitional paraprofessional, noting that Ms. Ye testified that the CSE specifically recommended a *transitional* paraprofessional "because the student did not exhibit behaviors that warranted the support of a 1:1 paraprofessional beyond the four months." Id. at 7. The SRO determined that the "evaluative information" that the CSE considered also supported the four-month transitional paraprofessional, and stated that the Progress Report results indicated N.M. had improved his ability to self-regulate. Id. It also noted that the Progress Report and Evaluation both showed that N.M. demonstrated general progress within his 8:1:4 class at Rebecca without the support of a 1:1 paraprofessional. Id.

Because it concluded that the DOE provided N.M. a FAPE, the SRO did not determine whether the Rebecca School was an appropriate unilateral placement or whether equitable

considerations weighed in the plaintiff's favor for relief. Id. at 8.

The plaintiff filed a timely appeal of the Second SRO on April 2, 2015.

### III.

### A.

On appeal, the plaintiff alleges that the DOE violated the IDEA and seeks direct payment of N.M.'s tuition to the Rebecca School for the 2010-11 school year. The Supreme Court has established a two-part test to determine whether parents are entitled to reimbursement: (1) was the IEP proposed by the school district inadequate or inappropriate; and (2) was the private placement appropriate to the child's needs. See Gagliardo II, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at 370). The first prong of the Burlington test is dispositive; "[o]nly if a court determines that a challenged IEP was inadequate should it proceed to the second question." M.C. v. Voluntown Bd. Of Educ., 226 F.3d 60, 66 (2d Cir. 2000); see also Walczak, 142 F.3d at 134 (holding that because the challenged IEP was adequate, defendant school board could not be ordered to reimburse parents for expenses incurred as a result of their decision to remove their child from the district's program). If the two-part Burlington test is satisfied, the Court has discretion to consider relevant equitable factors in fashioning

14

relief. Gagliardo II, 489 F.3d at 112 (citing Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)).Under the first prong of the Burlington test, a court must determine whether the IEP was inadequate or inappropriate. In making this determination, courts engage in a two-part inquiry "that is, first, procedural, and second, substantive." R.E., 694 F.3d at 189-90.

"At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." Id. at 190 (internal quotation marks and citation omitted). Procedural violations only entitle a parent to reimbursement "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" Id. (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." Id. (citing Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)); see also D.C., 950 F. Supp. 2d at 508.

Although the plaintiff asserted one procedural violation of the IDEA in her original complaint to this Court, she has not re-asserted that claim on appeal after remand.  Thus, only the

plaintiff's substantive challenges remain before the Court. See R.E., 694 F.3d at 190.

**B.**

To determine whether an IEP is substantively adequate, courts examine "whether it was reasonably calculated to enable the child to receive educational benefit[s]." Id. (internal citation and quotation marks omitted). A school district is not required to "furnish[ ] . . . every special service necessary to maximize each handicapped child's potential," Rowley, 458 U.S. at 199, but rather "fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). Thus, the education provided must be "sufficient to confer some educational benefit upon the handicapped child," Rowley, 458 U.S. at 200, but need not "provide[ ] everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (quotation omitted).

The IDEA's statutory scheme requires federal courts to pay "substantial deference to state administrative bodies on matters of educational policy." Cerra, 427 F.3d at 191. "[Q]uestions of class size, teaching methodologies and educational environments involve exactly the types of educational policy issues that

16

require district court deference to state administrative agencies." New York City Dep't of Educ. v. V.S., No. 10-CV-05120 (JG) (JO), 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011); see also F.O. v. N.Y.C. Dep't of Educ., 976 F. Supp. 2d 499, 511 (S.D.N.Y. 2013). "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." M.H., 685 F.3d at 244. A district court should also afford greater deference when its review is based entirely on the same evidence as that before the SRO. Id. The reviewing court "must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'" Gagliardo II, 489 F.3d at 113 (quoting Walczak, 142 F.3d at 130); see also T.G., 973 F. Supp. 2d at 342. The district court can decline to defer to the SRO's determination if it is "insufficiently reasoned," see M.H., 685 F.3d at 246, or fails to take into account opposing views, see F.O., 976 F. Supp. 2d at 513-14.

The plaintiff argues that the SRO's decision is not entitled to the deference it is generally owed for two reasons: (1) it failed to provide the "thorough" and "well-reasoned" analysis that deference demands, see Walczak, 142 F.3d at 129; and (2) the SRO did not adequately consider whether a 12:1:1

17

class alone would have provided N.M. with a FAPE for the final six months of the school year.

### i.

As an initial matter, the plaintiff misapprehends the limited nature of the Court's original remand by treating the second SRO opinion as having entirely supplanted the first. M.T. I resolved only *one* of the plaintiff's claims: that the original SRO erred in basing her conclusion in part on the possibility that the transitional paraprofessional could be extended past the four-month period provided in the IEP. See M.T. I, 47 F. Supp. 3d at 208. The other issues raised by the plaintiff's appeal were not addressed. The Court remanded the case for the specific purpose of determining whether the DOE provided a FAPE without resort to the improper evidence regarding extending the term of the transitional paraprofessional beyond the four months provided in the IEP. Id. at 208-09.

Accordingly, the Court reviews the administrative record as a whole, taking into account both SRO decisions. See Walczak, 142 F.3d at 130 (noting a district court's "independent review" requires an examination of the administrative record in its entirety).

The first SRO thoroughly considered the available evidence, the plaintiff's claims, and each element of the IEP before concluding that the DOE provided N.M. with a FAPE. She discussed

observations of N.M. in the classroom in 2009, the May 2010 Progress Report, and the May 2010 Evaluation. She reviewed both the favorable and unfavorable conclusions in the 2010 evaluative report. See SRO Op. I at 11 (explaining N.M.'s Evaluation noted his "full scale IQ did not 'accurately represent the variations that exist within his cognitive profile,'" and that he demonstrated "an overall Elevated level" of maladaptive behaviors). In addition, the first SRO mentioned that the Rebecca psychologist recommended a "highly structured class" with "a low student-to-teacher ratio." See SRO Op. I at 11. The SRO made specific findings that supported all of the CSE's recommendations, listing each of the concerns identified by the plaintiff and noting how the IEP addressed them.

The first SRO decision is persuasive and deserves deference. The Court reviews the second SRO decision on the narrow question of whether the school provided a FAPE without the option to extend the transitional paraprofessional beyond four months.

**ii.**

The plaintiff argues that the second SRO failed to provide a thorough and well-reasoned opinion because the SRO did not support the SRO's conclusion with evidence from the record.

First, the plaintiff argues that the SRO erred in both relying on and misconstruing the Evaluation and Progress Report.

19

The Court has already noted that the Progress Report and
Evaluation constitute "considerable record evidence in this case
that N.M. can progress in a classroom without a 1:1
paraprofessional beyond a transitional four-month period," and,
thus, support the adequacy of the IEP. M.T. I, 47 F. Supp. 3d at
208-09. The same remains true. Among its various test results,
the Evaluation showed that academics constituted one of N.M.'s
weakest skill sets, in which he scored in the "very low range."
Ex. 5 at 6. Accordingly, the CSE sought to provide an IEP that
would allow N.M. to "develop academic skills." Tr. 123, 678. The
Evaluation also showed that N.M. had an IQ in the "average
range," which indicated his ability to "follow a General
Education curriculum with the appropriate support," Tr. 121-22;
see Ex. 5 at 4; Tr. 517 (Ms. Swope testifying an average IQ
score showed N.M. had "potential" to "reach a certain level");
Tr. 663.

Given the disparity between N.M.'s raw potential on the one
hand and low academic achievement on the other, the CSE
reasonably concluded that a general education curriculum would
focus N.M.'s education on the academic skills he needed. See Tr.
121-23, 678-79 (noting the IEP's goal of exposing N.M. to the
general education curriculum to close the gap between his IQ and
academic ability).

The record also supports the CSE's conclusion that a community school placement was appropriate given N.M.'s IQ score. The CSE is obligated to recommend a placement that would be the "least restrictive environment" for the student, 20 U.S.C. 1412(a)(5) - that is, in an environment where the child will be educated with non-disabled peers to the maximum extent appropriate. If "the district can supply the needed services, then the public school is a preferred venue for educating the child." W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 148 (S.D.N.Y. 2006). Here, N.M.'s average cognitive abilities allowed him to "function in our society," and thus, the least restrictive option was one that would expose him to "typically-developing people." Tr. 679. Because P.S. 20 educated both "typically-developing" and special education children, P.S. 20 constituted N.M.'s least restrictive option. Accordingly, the CSE considered the empirical, objective Evaluation results in drafting the IEP, and, therefore, made the student-specific determination that the IDEA requires. Furthermore, the statute only requires that the CSE recommend a program that provides the student with a "basic floor of opportunity," not one that offers the best services available. Walczak, 142 F.3d at 132. Recommending an IEP designed to improve N.M.'s academic and social capabilities fulfilled that obligation. The SRO did not

err in relying on the Evaluation to support its finding that the DOE offered an adequate IEP.

To support her argument that the SRO's decision was not backed by evidence and was not well-reasoned, the plaintiff also points to seemingly contradictory testimony by Dr. Feliciano, a Rebecca School psychologist.  Dr. Feliciano testified that she believed N.M. would "struggle" in a 12:1:1 setting, although she conceded that whether N.M. struggled in such a setting "would depend a lot on the climate of the classroom." Tr. 441-42. Dr. Feliciano's equivocal testimony does not render the recommended program inadequate.  An SRO's decision that a class size is appropriate should not be reversed based on conflicting testimony from parents' witnesses.  See T.G., 973 F. Supp. 2d at 343; V.S., 2011 WL 3273922, at *13.

Second, the plaintiff alleges the SRO misinterpreted the Progress Report. The plaintiff contends that the Progress Report showed that N.M. had not made progress, mainly in the area of self-regulation. However, the Progress Report did in fact show that N.M. had made significant progress in his ability to self-regulate, even if it remained an issue for him. See Ex. 9 at 1-2. The plaintiff also argues that the SRO overlooked in its discussion of the Progress Report N.M.'s continued emotional and social developmental difficulties.  This is not the case. The

SRO expressly recognized that these developmental issues remained challenges for N.M. See SRO Op. II at 7 n.5.

Third, the plaintiff claims that the SRO failed to include information describing how N.M.'s dysregulation periods are better addressed at the Rebecca School.  But this argument is immaterial; even if the supports and strategies at Rebecca increased the likelihood of N.M. making greater social and emotional development than those at P.S. 20, this fact alone would not render N.M.'s IEP inadequate.  See Walczak, 142 F.3d at 133 ("[I]nadequacy of an IEP is not established . . . simply because parents show that a child makes greater progress in a single area in a different program." (citation omitted)).

Fourth, the plaintiff argues that, even if N.M. had improved, the SRO did not explain how N.M.'s improvement demonstrated that a 12:1:1 classroom with a transitional paraprofessional was appropriate. But the Report noted that N.M. was improving, and the SRO reasonably concluded that, with continued improvement, less adult support would be necessary. See Ex. 9 at 1 (explaining "[N.M.] now becomes dysregulated less and can calm himself down with minimal adult support," and that he "needed more support from the adults [a few months earlier]."). Testimony from the plaintiff's own witnesses supports this conclusion. See, e.g., Tr. 365-67 (Ms. McCourt stating "[N.M.'s] ability to use language effectively across all

23

emotional areas has definitely improved"); Tr. 439 (Dr.
Feliciano testifying "[h]e is definitely much more comfortable"
in the "social emotional realm").

Fifth, the plaintiff contends that the SRO misconstrued the
testimony of the district's special education teacher, Ms. Ye.
The SRO stated that Ms. Ye and the CSE recommended a
transitional paraprofessional for the first four months of the
school year "because the student did not exhibit behaviors that
warranted the support of a 1:1 paraprofessional beyond the four
months." SRO Op. II at 7.  Ms. Ye testified that "[N.M.] [did
not] need a one to one para in the . . . normal sense of having
behavioral problems. So, that's [why] we recommend a
transitional – just to make the transition more smooth for him."
Tr. 42. The plaintiff claims Ms. Ye's testimony was equivocal
and, thus, cannot be interpreted as an endorsement of a four-
month transitional paraprofessional.  But the plaintiff's claim
is belied by the record, in which Ms. Ye and Ms. Chase supported
the four-month paraprofessional.  See Tr. 103, 106-07, 198-200.
Ms. Ye was also one of the IEP drafters who supported the
ultimate offer. See IHO Opinion ("IHO Op.") at 18 (noting the
"only members of the team that agreed with the recommendation .
. . were the ones who worked for the school district," which
included Ms. Ye).

24

### iii.

The plaintiff also argues that the SRO did not adequately consider whether a 12:1:1 class alone would have provided N.M. with a FAPE for the final six months of the school year when N.M. no longer had the four-month transitional paraprofessional.

This contention incorrectly represents the IEP by suggesting that it provided solely for a 12:1:1 class for the final six months of the school year.  The IEP consisted of the 12:1:1 special class and a four-month transitional paraprofessional along with related services that continued throughout the school year to address N.M.'s social and emotional development.  See Ex. 4.  Those services included counseling to address N.M.'s social and emotional management needs, occupational therapy, and speech therapy.  See M.T. I., 47 F. Supp. 2d at 203. To the extent that M.T.'s expert witnesses offered contrary testimony that the SRO rejected, "a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews." G.W. v. Rye City Sch. Dist., No. 11-cv-8208 (ER), 2013 WL 1286154, at *18 (S.D.N.Y. Mar. 29, 2013), aff'd, 554 F. App'x 56 (2d Cir. 2014).

In sum, after reviewing the evidence on a contested matter of educational policy, the SRO found both in 2013 and in 2015 that a 12:1:1 class, in conjunction with a 1:1 transitional

25

paraprofessional for a four-month period, and related services
for the entire ten-month school year, was reasonably calculated
to enable N.M. to receive educational benefits, and, thus,
concluded that the DOE had offered N.M. a FAPE for the 2010-11
school year.  The SRO's analysis, which was based on the same
evidence as before this court, M.H., 685 F.3d at 244, was
thorough and well-reasoned.  The SRO's findings are fully
supported by the record and deserve deference.  See, e.g.,
Walczak, 142 F.3d at 129 ("Deference is particularly appropriate
when, as here, the state hearing officers' review has been
thorough and careful."); D.A.B., 973 F. Supp. 2d at 360.

     Having determined that both SRO decisions are entitled to
deferential review, the Court accepts their conclusions that
N.M. would make meaningful progress in a 12:1:1 setting, along
with a transitional paraprofessional for four months and other
related services for the entire school year.

     Because the Court concludes that the DOE offered N.M. a
FAPE, it does not address whether the plaintiff has established
that N.M.'s unilateral placement at the Rebecca School was
appropriate.  See, e.g., Walczak, 142 F.3d at 134.

                          **CONCLUSION**

     The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, they are
either moot or without merit. For the reasons explained above,

the defendant's motion for summary judgment is **granted**. The plaintiff's motion for summary judgment on the IDEA claims is **denied**. The Clerk is directed to enter Judgment for the defendant. The Clerk is also directed to close all pending motions and close the case.

**SO ORDERED.**

**Dated:**   **New York, New York**
            **August 4, 2016**            _____/s/_____
                                              **John G. Koeltl**
                                     **United States District Judge**

27